**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-2013

AMY MCCRAKEN,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS, ELBERT COUNTY, COLORADO,

      Defendant.

---

### COMPLAINT AND JURY DEMAND

---

      Plaintiff Amy McCraken ("Ms. McCraken"), by and through her attorney, Aaron Slade, Esq. of Novo Legal Group, L.L.C., hereby submits her Complaint against the Board of County Commissioners for Elbert County, Colorado ("Elbert County"), and in support thereof states as follows.

### INTRODUCTION

      Ms. McCraken lives with a disability: she walks with the assistance of a prosthetic right leg. As a result, Ms. McCraken has limited mobility and ability to ambulate. Deputies of the Elbert County Sheriff's Office ("ECSO") knew about Ms. McCraken's disability and her limited mobility. Nevertheless, ECSO deputies left her stranded in the middle of the night in an extremely remote, rural area of Colorado with no transportation, after refusing to give her a ride home upon her release from the Elbert County Jail. Faced with no other option, and following orders from the ECSO deputies to leave the jail, Ms. McCraken had no choice but to walk 8.8 miles from the jail

to her home, on uneven dirt and gravel roads in the middle of the night. Walking such a distance on her prosthetic limb left Ms. McCraken with severe injuries, and she suffered humiliation and emotional distress throughout her ordeal. Ms. McCraken files this lawsuit pursuant to Title II of the Americans with Disabilities Act ("ADA") and the Colorado Anti-Discrimination Act ("CADA") to vindicate her rights against disability discrimination at the hands of government entities.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

3.      Plaintiff Amy McCraken is a member of the Elbert County community and a resident of Elbert County, Colorado. At all relevant times, Plaintiff Amy McCraken resided within the District of Colorado.

4.      Defendant Board of County Commissioners for Elbert County, Colorado is a local government entity of the State of Colorado and within the District of Colorado. The Elbert County Sheriff and Elbert County Jail are government services provided by Defendant Elbert County. The deputies of the ECSO and Elbert County Jail were at all relevant times agents of Defendant Elbert County acting within the scope of their employment.

5.      Now and at all relevant times alleged in this Complaint, Defendant Elbert County was directly involved and responsible for all hiring, training, supervision, policies, and customs of the ECSO and Elbert County Jail during the incidents described herein.

## **FACTUAL ALLEGATIONS**

***Ms. McCraken's Disability***

6.      At the time she encountered deputies of the ECSO, Ms. McCraken was 54 years old, approximately five feet and five inches tall, and weighed approximately 110 pounds.

7.      Ms. McCraken lives with an obvious and apparent disability. She uses a lower-limb prosthetic device to ambulate. Ms. McCraken has used a lower-limb prosthesis since 2014, when she underwent a below-the-knee amputation of her right leg as a result of a horseback riding accident. A photograph of Ms. McCraken's prosthetic limb appears below.



8.      Ms. McCraken's disability substantially limits her ability to perform major life activities including walking, especially for long periods of time.

***The Services of the Elbert County Sheriff's Office and Elbert County Jail***

9.      The unincorporated town of Kiowa, Colorado, is located within Elbert County.

10.     The town of Kiowa has a population of 746 people and is in an extremely remote area of rural Colorado.

11.     There are no public transportation services in the town of Kiowa. There are no buses, light rail, or taxis. Private transportation services such as Uber and Lyft do not operate in the town of Kiowa.

12.     The area surrounding the town of Kiowa is comprised of rural country roads and large plains as shown by the below capture of a satellite map of the area.



13.     The town of Kiowa houses the county seat of Elbert County along with the Elbert County Jail and Sheriff's Office.

14.     The ECSO provides a variety of services to the Elbert County Community. Primarily, it "ensur[es] that Elbert County, CO, is a safe place to live, work and visit."[1]

15.     Furthermore, the ECSO promises "to provide protection and service to our community as a whole."[2]

16.     The ECSO also operates the Elbert County Jail through its Detention Division.[3]

17.     The jail "houses all classifications of adult male and female inmates" and "holds both unadjudicated and sentenced inmates."[4]

18.     The ECSO Detention Division prioritizes "safety and security for staff and inmates."[5]

19.     As a member of the Elbert County community and a resident of Elbert County, Colorado, Ms. McCraken meets the essential eligibility requirements for receipt of services from the ECSO and the Elbert County Jail, with or without a reasonable accommodation for her disability.

***Elbert County's Seizure of Amy McCraken on August 1, 2022***

20.     At or around 9:30 PM on August 1, 2022, Ms. McCraken was driving home along County Road 45 in Kiowa after having dinner with her children in Denver, Colorado.

---

[1] Elbert County, Colorado, *Sheriff's Office*, ELBERTCOUNTY-CO.GOV, https://www.elbertcounty-co.gov/181/Sheriffs-Office (last visited July 18, 2024).
[2] *Id*.
[3] Elbert County, Colorado, *Detentions*, ELBERTCOUNTY-CO.GOV, https://www.elbertcounty-co.gov/186/Detentions (last visited July 18, 2024).
[4] *Id*.
[5] *Id*.

21.     ECSO deputy Dustin Pastore stopped Ms. McCraken for expired registration tags on her car's license plates.

22.     Ms. McCraken explained to Deputy Pastore that she had recently purchased the vehicle from her mother and had not yet switched the rear license plate. Ms. McCraken also provided valid registration for the vehicle.

23.     When Deputy Pastore ran Ms. McCraken's driver license through the Department of Motor Vehicles ("DMV") and Colorado Crime Information Center ("CCIC") databases, the results showed her license was revoked due to a February 2022 Driving While Ability Impaired ("DWAI") charge.

24.     Ms. McCraken's driver license should have been merely restricted because of her compliance with a deferred judgment on the February 2022 DWAI charge; however, the DMV and CCIC systems erroneously displayed that her license was revoked.

25.     With a restricted license, Ms. McCraken could have lawfully driven her car that night; however, with a revoked license, Ms. McCraken was not allowed to drive at all.

26.     Ms. McCraken explained to Deputy Pastore that her license was in restricted status but was not revoked.

27.     Deputy Pastore nevertheless executed a warrantless arrest of Ms. McCraken and issued her citations for driving under restraint and displaying a cancelled license plate.

28.     Deputy Pastore put Ms. McCraken in handcuffs and directed her to get in the back of his patrol car.

29.     Deputy Pastore saw that Ms. McCraken had an obvious and apparent disability and walked with a prosthetic limb when she exited her car to get in the back of the patrol car.

30.     Because of her disability, Ms. McCraken routinely enters vehicles from the passenger side of the car, which allows her to enter a vehicle safely and comfortably without difficulty and pain from first placing her prosthetic leg into the car.

31.     Regardless, Deputy Pastore ordered Ms. McCraken to enter the back of his patrol car from the driver side of the car resulting in an uncomfortable and humiliating process for Ms. McCraken as she was forced to awkwardly raise and position her prosthetic leg into the car first.

32.     Deputy Pastore impounded Ms. McCraken's car and transported her to the Elbert County Jail.

33.     Deputies of the ECSO decided to tow Ms. McCraken's car to an impound lot in Castle Rock, Colorado, an approximately forty-five-minute, twenty-five-mile drive away from where she had been pulled over.

***Elbert County's Failure to Provide Reasonable Modifications to its Programs and Services.***

34.     When Ms. McCraken arrived at the Elbert County Jail, ECSO deputies booked and detained Ms. McCraken in a holding cell.

35.     Ms. McCraken wore shorts that night and her prosthetic leg was clearly visible.

36.     All of the ECSO deputies working at the jail that night saw Ms. McCraken's prosthetic leg and observed her limited ability to walk.

37.     ECSO deputies promised Ms. McCraken that she would be able to use the telephone soon after her intake process was complete so that she could arrange and pay her bond, as well as obtain transportation home.

38.     Ms. McCraken waited in her holding cell for approximately two hours until she voiced to the ECSO deputies that she needed to use the restroom.

39.      There was no toilet in her holding cell, only a flat bench to sit on.

40.      The ECSO deputies refused to let her use the jail restroom unsupervised. The deputies explained to Ms. McCraken that because she was disabled and walked with a prosthetic leg, they had to supervise her while she used the restroom out of fear she would fall and injure herself.

41.      An ECSO deputy insisted that she use the restroom while he held the door open and watched.

42.      ECSO deputies then left Ms. McCraken languishing in a holding cell for another two hours until approximately 2:00 AM and refused to allow her to use the jail telephone or her cell phone which ECSO deputies confiscated during her booking process.

43.      While waiting in her holding cell, Ms. McCraken observed that she was the only person housed in the jail that night. She also observed ECSO deputy Kissinger watching television shows and movies while she waited for hours hoping to use the phone.

44.      Ms. McCraken could have easily arranged to pay her bond and acquired safe transportation home if the ECSO deputies allowed her to make a phone call after she was initially booked into custody, around 10:00 PM.

45.      The ECSO failed to consider that, because of Ms. McCraken's disability and limited mobility, she faced a higher risk of harm than other, non-mobility impaired people if she were not able to use the jail telephone at a reasonable hour of the day to secure safe transportation home.

46.      For example, because of her disability and limited mobility, she cannot ride a bike, run, jog, or walk home without potentially serious injury. Furthermore, she cannot run to escape a

potentially dangerous situation and has limited ability to physically defend herself if she were attacked while walking home.

47.     As a result, the ECSO failed to modify its telephone call procedure to accommodate Ms. McCraken's disabled status — limited mobility with no transportation — and chose instead to deny Ms. McCraken her phone call until approximately 2:00 AM on August 2, 2022.

48.     When finally allowed to use the phone at or around 2:00 AM, Ms. McCraken anxiously tried to contact family members and friends, but because of the late hour, no one was available or awake to take her call.

49.     Eventually, Ms. McCraken reached her son who helped pay her bond, allowing her release.

50.     Ms. McCraken's son was the only person that answered her call, but he lived approximately sixty miles away from the Elbert County Jail in west Denver and did not have a car to drive.

51.     As such, while Ms. McCraken's son was able to assist paying her bond, he was unable to pick her up and transport her home.

52.     After paying her bond, Ms. McCraken informed the ECSO deputies that she was unable to reach anyone to give her a ride home.

53.     Ms. McCraken asked the ECSO deputies if they could give her a ride home. In response, the deputies denied her a ride home and told her that she "had to" leave the premises.

54.     The ECSO deputies denied Ms. McCraken transportation home despite knowing: (1) it was after 2:00 AM, (2) that she is disabled and has limited mobility, (3) that the jail is in an extremely remote, rural area of Colorado, (4) that there were no buses, light rail, taxis or ride-

sharing services available in the area, and (5) that Ms. McCraken could not reach a friend or family member who was able to give her a ride home at such a late hour.

55.     The ECSO deputies affirmatively ordered Ms. McCraken to leave the jail after she paid her bond despite having the option to allow Ms. McCraken to stay a few more hours overnight in the jail pursuant to § 16-4-102, C.R.S. (2022).

56.     Under that statute, the ECSO could "allow an individual to choose to stay in jail overnight after release when extenuating circumstances exist, including inclement weather, lack of transportation, or lack of shelter." § 16-4-102, C.R.S. (2022).

57.     Just like their failure to modify the telephone procedure, the ECSO deputies failed to take into consideration that, because of Ms. McCraken's disability and limited mobility, she faced a higher risk of harm than other, non-mobility impaired people if she were left alone to walk home without transportation late at night: because of her disability and limited mobility, she cannot ride a bike, run, jog, or walk home without serious injury, she cannot run to escape a potentially dangerous situation, and she has limited ability to physically defend herself if she were attacked.

58.     The ECSO deputies should have accommodated Ms. McCraken's disabled status and modified their procedures to provide her a ride home or allowed her to stay overnight in the jail but they refused to do so.

59.     Given the failure to accommodate Ms. McCraken in any way, ECSO deputies left her with no choice but to begin an 8.8 mile walk home in the dead of night, alone and unprotected.

***The reasonable modifications available to ECSO were not fundamental alterations.***

60.     The reasonable modifications available to the ECSO would not have fundamentally altered its existing services or provided Ms. McCraken a special, individualized service.

61.     The reasonable modifications available to the ECSO included but were not limited to: (1) allowing Ms. McCraken to use the jail telephone to secure transportation home after her booking process was complete at approximately 10:00 PM, (2) allowing Ms. McCraken the option to stay overnight in the Elbert County Jail instead of ordering her to leave, or (3) providing Ms. McCraken a ride home.

62.     These reasonable modifications would have enabled Ms. McCraken to enjoy the benefits of the ECSO's programs and services in the same way that a non-disabled person could.

63.     Ms. McCraken would have avoided the serious injury and heightened risk of harm caused by walking home on a prosthetic leg with limited mobility that other, non-mobility impaired people do not experience.

64.     Had the ECSO made the above reasonable modifications, Ms. McCraken could have benefited from ECSO's promise "to provide protection and service to our community as a whole"[6] the same as other, non-mobility impaired community members.

65.     Furthermore, it was feasible for the ECSO to provide Ms. McCraken a ride home.

66.     There were multiple ECSO deputies on duty at the jail that night, one of which was watching movies and television shows while she was detained there.

67.     Ms. McCraken was the only person in the ECSO jail that night.

68.     Further, law enforcement officers in other jurisdictions routinely provide community members transportation in a variety of other contexts.

---

[6] Elbert County, Colorado, *Sheriff's Office*, ELBERTCOUNTY-CO.GOV, https://www.elbertcounty-co.gov/181/Sheriffs-Office (last visited July 18, 2024).

69.    For example, law enforcement officers have given community members a ride to a gas station when their car has run out of gas.

70.    Law enforcement officers have given community members who are intoxicated a ride home because they cannot safely drive themselves.

71.    Finally, law enforcement officers have given community members a ride home if they feel vulnerable to attack or are being harassed while walking home.

***Ms. McCraken's Damages***

72.    An illustration of the 8.8 walk Ms. McCraken endured during the early morning hours of August 2, 2022 is shown below:



73.     It is blind luck that Ms. McCraken was not victimized during her risky and dangerous walk home, following the orders of the ECSO to leave the jail.

74.     Approximately four miles of Ms. McCraken's journey home were along narrow stretches of high-speed highways with no shoulder in place.

75.     The following four miles were on high-speed washboard dirt and gravel roads with uneven terrain.

76.     Ms. McCraken wore only a flip-flop, shorts, and a tank-top that night, not realizing that she was eventually going to be left stranded on a remote highway with no means of transportation by the very entity that promises to provide "protection and service to our community as a whole."[7]

77.     Ms. McCraken persisted through the extreme fear, humiliation, and physical pain caused by walking such an incredible distance on a prosthetic leg, and eventually reached her home around 8:00 AM on August 2, 2022.

78.     By the end of her walk home, her prosthetic leg was broken and falling apart as a result of walking such a long distance.

79.     Ms. McCraken experienced significant pain and soreness throughout her left leg because she uses her left leg as her primary weight bearing limb.

80.     She experienced severe pain in her left foot because of the long distance she walked wearing only a flip-flop.

81.     Ms. McCraken had severe bruises and blisters on her residual right limb caused by the rubbing at the contact point between her right leg and her prosthesis.

---

[7] *Id.*

82.     Ms. McCraken experienced significant swelling in her right leg and sores and abrasions from the repetitive pressure against her prosthetic limb.

83.     The continuous impact against the pavement and uneven washboard roads also aggravated Ms. McCraken's existing arthritis conditions.

84.     In the weeks and months following, Ms. McCraken sought treatment for the injuries she suffered because of ECSO's conduct.

85.     Ms. McCraken's treating providers discovered that she likely suffered a stress fracture in her left foot and nerve damage in her residual right limb.

86.     The nerve damage in her residual right limb caused shooting pain throughout her right leg that felt like she was getting hit with a taser. The shooting pain occurred constantly for weeks after her ordeal.

87.     Ms. McCraken also suffered emotionally from ECSO's discriminatory practices.

88.     The ECSO caused Ms. McCraken to endure a very humiliating experience throughout her arrest, booking, detention, and eventual 8.8 mile walk home in the middle of the night.

89.     Ms. McCraken felt extremely vulnerable and feared for her physical safety throughout her walk home that night.

90.     Ms. McCraken felt abused and mistreated by the very entity that was supposed to protect her.

91.     The experience made her feel cast-out from her own community and lesser than other community members who don't live with disabilities.

92.     As a result, Ms. McCraken suffered psychological and emotional distress for which she receives counseling.

93.     Finally, Ms. McCraken suffered financially because of ECSO's discriminatory practices.

94.     She had to pay thousands of dollars for additional medical expenses, treatment, and counseling that she otherwise would not have had to incur but for ECSO's conduct.

***Ms. McCraken is Cleared of Any Wrongdoing Related to her Arrest on August 1, 2022.***

95.     In the months following her arrest and detention, Ms. McCraken fought to clear her name and correct the system error that resulted in her arrest.

96.     She succeeded when the Elbert County District Attorney moved to dismiss all of the charges against her, clearing her of any wrongdoing.

97.     On October 12, 2022, the County Court of Elbert County, Colorado ordered all charges dismissed against Ms. McCraken related to her arrest on August 1, 2022.

## CLAIMS FOR RELIEF
### COUNT ONE
### Title II of the ADA - 42 U.S.C. § 12132 – Failure to Make Reasonable Modifications
### Against Defendant Elbert County

98.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

99.     Ms. McCraken lives with an obvious and apparent disability. She uses a lower-limb prosthetic device to ambulate. Ms. McCraken has used a lower-limb prosthesis since 2014, when she underwent a below-the-knee amputation of her right leg as a result of a horseback riding accident.

100.    At all times relevant to her allegations in this Complaint, Ms. McCraken met the essential eligibility requirements for the receipt of services from the ECSO, including the Elbert County Jail.

101.    Those services include, but are not limited to, protection and service, giving commands, arrests, post-arrest transportation, transporting and impounding her car, detention, use of the jail restroom, and use of the jail telephone.

102.    The benefits of those services include "protection and service to our community as a whole" from the deputies of the ECSO and "that Elbert County, CO, is a safe place to live, work and visit."[8]

103.    The ECSO deputies knew and had notice of Ms. McCraken's disability and her need for reasonable modifications because they observed her obvious and apparent use of a prosthetic limb to ambulate and her limited mobility throughout her arrest, detention, and eventual release.

104.    Elbert County denied Ms. McCraken the benefits of its services and programs and failed to provide Ms. McCraken reasonable modifications of its programs necessary to avoid discrimination on the basis of disability when: (1) ECSO deputies refused to allow Ms. McCraken to use the jail telephone until 2:00 AM and prevented her from securing safe transportation home; (2) ECSO deputies refused to allow or offer Ms. McCraken the option to stay overnight in the Elbert County jail, instead ordering her to leave the jail; and (3) ECSO deputies ordered Ms. McCraken to leave the Elbert County Jail while refusing to provide her with a ride home.

---

[8] *Id.*

105.    The reasonable modifications available to the ECSO included, but were not limited to: (1) allowing Ms. McCraken to use the jail telephone to secure transportation home after her booking process was complete at approximately 10:00 PM, (2) allowing Ms. McCraken the option to stay overnight in the Elbert County Jail instead of ordering her to leave, or (3) providing Ms. McCraken a ride home.

106.    These reasonable modifications would have enabled Ms. McCraken to enjoy the benefits of the ECSO's programs and services in the same way that a non-disabled person could.

107.    Ms. McCraken would have avoided the serious injury and heightened risk of harm she experienced by walking home on a prosthetic leg with limited mobility that other, non-mobility impaired people do not experience.

108.    Had the ECSO made the above reasonable modifications, Ms. McCraken could have benefited from ECSO's promise "to provide protection and service to our community as a whole"[9] the same as other, non-mobility impaired community members.

109.    As such, the reasonable modifications available to ECSO were not fundamental alterations to the nature of the services offered by the ECSO.

110.    ECSO deputies knew or should have known there was a substantial likelihood that failing to modify its programs and services to accommodate Ms. McCraken's obvious and apparent disability and mobility limitations would result in a violation of her rights and cause her harm, but nonetheless failed to act on that likelihood.

111.    ECSO's failures were done intentionally and with deliberate indifference to the strong likelihood of violations to Ms. McCraken's federally protected rights.

---

[9] *Id.*

**COUNT TWO**
**Colorado Anti-Discrimination Act ("CADA") – 24-34-802, C.R.S. – Disability**
**Discrimination**
**Against Defendant Elbert County**

112.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

113.     Ms. McCraken lives with an obvious and apparent disability. She uses a lower-limb prosthetic device to ambulate. Ms. McCraken has used a lower-limb prosthesis since 2014, when she underwent a below-the-knee amputation of her right leg as a result of a horseback riding accident.

114.     At all times relevant to her allegations in this Complaint, Ms. McCraken met the essential eligibility requirements for the receipt of services from the ECSO, including the Elbert County Jail.

115.     Those services include, but are not limited to, protection and service, giving commands, arrests, post-arrest transportation, transporting and impounding her car, detention, use of the jail restroom, and use of the jail telephone.

116.     The benefits of those services include "protection and service to our community as a whole" from the deputies of the ECSO and "that Elbert County, CO, is a safe place to live, work and visit."[10]

117.     The ECSO deputies knew and had notice of Ms. McCraken's disability and her need for reasonable modifications because they observed her obvious and apparent use of a

---

[10] *Id.*

18

prosthetic limb to ambulate and her limited mobility throughout her arrest, detention, and eventual release.

118.    Elbert County denied Ms. McCraken the benefits of its services and programs and failed to provide Ms. McCraken reasonable modifications of its programs necessary to avoid discrimination on the basis of disability when: (1) ECSO deputies refused to allow Ms. McCraken to use the jail telephone until 2:00 AM and prevented her from securing safe transportation home; (2) ECSO deputies refused to allow or offer Ms. McCraken the option to stay overnight in the Elbert County jail, instead ordering her to leave the jail; and (3) ECSO deputies ordered Ms. McCraken to leave the Elbert County Jail while refusing to provide her with a ride home.

119.    The reasonable modifications available to the ECSO included, but were not limited to: (1) allowing Ms. McCraken to use the jail telephone to secure transportation home after her booking process was complete at approximately 10:00 PM, (2) allowing Ms. McCraken the option to stay overnight in the Elbert County Jail instead of ordering her to leave, or (3) providing Ms. McCraken a ride home.

120.    These reasonable modifications would have enabled Ms. McCraken to enjoy the benefits of the ECSO's programs and services in the same way that a non-disabled person could.

121.    Ms. McCraken would have avoided the serious injury and heightened risk of harm she experienced by walking home on a prosthetic leg with limited mobility that other, non-mobility impaired people do not experience.

122.     Had the ECSO made the above reasonable modifications, Ms. McCraken could have benefited from ECSO's promise "to provide protection and service to our community as a whole"[11] the same as other, non-mobility impaired community members.

123.     As such, the reasonable modifications available to ECSO were not fundamental alterations to the nature of the services offered by the ECSO.

124.     ECSO deputies knew or should have known there was a substantial likelihood that failing to modify its programs and services to accommodate Ms. McCraken's obvious and apparent disability and mobility limitations would result in a violation of her rights and cause her harm, but nonetheless failed to act on that likelihood.

125.     ECSO's failures were done intentionally and with deliberate indifference to the strong likelihood of violations to Ms. McCraken's rights.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award all relief as allowed by law and equity, including, but not limited to the following:

(a)     Compensatory damages, including but not limited to those for physical injury, emotional distress, and pain and suffering;

(b)     Actual economic and consequential damages;

(c)     Declaratory relief and other appropriate equitable relief;

(d)     Pre-judgment and post-judgment interest at the highest lawful rate;

(e)     Attorney's fees and costs; and

---

[11] *Id.*

     (f)      Such further relief as justice requires.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

DATED this 22nd day of July, 2024.

                                      Respectfully submitted,

                                      *s/ Aaron Slade*
                                      Aaron Slade, Esq.
                                      NOVO LEGAL GROUP, LLC
                                      4280 Morrison Rd.
                                      Denver, CO 80219
                                      T: 303-335-0250
                                      F: 303-296-4586
                                      E: aslade@novo-legal.com