| | |
|---|---|
| District Court, Elbert County, Colorado<br>751 Ute Ave. P.O. Box 232<br>Kiowa, CO 80117 | DATE FILED<br>September 25, 2024 6:21 PM<br>FILING ID: 71FCCFA3582AA<br>CASE NUMBER: 2024CV30091 |
| Plaintiff:   **ELBERT COUNTY SHERIFFS OFFICE, and TIMOTHY NORTON,** in his capacity as Sheriff of Elbert County<br><br>v.<br><br>Defendant**:**   **BOARD OF COUNTY COMISSIONERS OF ELBERT COUNTY COLORADO, and SHAWN FLETCHER,** in his capacity as County Manager | COURT USE ONLY |
| **Attorneys for Plaintiff:**<br>Todd Collins & Associates, LLC<br>Todd Collins, 49544<br>Stephanie Williams, 57681<br>Marc Tull, 19013 (Of Counsel)<br>724 E Kiowa Ave Suite 5<br>P.O. Box 456<br>Elizabeth, CO 80107<br>Phone: (303) 588-2200<br>Fax: (800) 787-9516<br>Email: tcollins@tcollinsatlaw.com<br>        stephanie@tcollinsatlaw.com<br>        marc@tcollinsatlaw.com | Case No.:<br><br>Division:   **1** |
| **COMPLAINT PURSUANT TO C.R.C.P 57 AND C.R.S. §§ 13-51-102, 105 SEEKING DECLARATORY JUDGMENT** | |

COMES NOW, Plaintiffs, Elbert County Sheriff's Office and Tim Norton in his capacity as Elbert County Sheriff, by and through their attorneys, Todd Collins & Associates, LLC, and submit to this Honorable Court their Complaint Pursuant to C.R.C.P. 57 and C.R.S. §§ 13-51-102, 105 Seeking a Declaratory Judgment.  Plaintiffs offer the following in support hereof:

## **PARTIES**

1.     Plaintiff, Elbert County Sheriff's Office (hereinafter "ECSO"), is a constitutional entity created by the Constitution of the State of Colorado, Article XIV, sec. 8 whose address is 751 Ute Avenue, Kiowa, Colorado 80117.

1

2. Plaintiff, Timothy Norton, is the duly elected Sheriff of Elbert County, Colorado who is responsible for the oversight and administration of the ECSO including, but not limited to, the promulgation and administration of ECSO policies and procedures.

3. Defendant, Elbert County Board of County Commissioners of Elbert County (hereinafter "the BOCC") is the governing body of Elbert County, which is a political subdivision of the State of Colorado, whose address is 215 Comanche Street, Kiowa, Colorado 80117.

4. Defendant, Shawn Fletcher, is an employee of Elbert County, Colorado and he serves as the county manager. Mr. Fletcher currently resides in El Paso County, Colorado.

**Jurisdiction and Venue**

5. The Court has jurisdiction over the issue pursuant to Colo. Const. Article VI, sec. 9 and C.R.C.P. 57(a).

6. Venue is proper in Elbert County, pursuant to C.R.C.P. 98 and C.R.C.P. 57(a) because Plaintiffs' and Defendants' principal places of operation are in Elbert County, Colorado.

**Issues to be Resolved**

7. May the BOCC establish and adopt ordinances and policies regarding hiring and termination of law enforcement officers ("LEO") and staff of the ECSO? In short, may the BOCC and department heads interfere with the Sheriff's statutory authority to hire and terminate LEOs and staff of the ECSO?

8. May department managers of the County such as the county manager and director of human resources interfere with the Sheriff's assignment of responsibilities and duties to LEOs and staff of the ECSO? In short, does the authority granted to the county manager by the BOCC in the County Manager's Policy provide the county manager with authority beyond his/her legal authority as it relates to assignment of duties to staff and LEOs of the ECSO?

9. May the BOCC and County Manager establish policies applicable to the ECSO that interfere with the Sheriff's authority to make final decisions as to the use of real and personal property purchased for and utilized by the ECSO?

**Facts/General Allegations**

10. Elbert County, Colorado is **not a home-rule county** as established by Colo Const. Article XIV, sec. 16 and Title 30, art. 35, C.R.S. Yet, the BOCC and the county manager, Shawn Fletcher, believe they possess authority over the operations and administration of the ECSO. For the past year and a half, they have been acting on such wrongful beliefs.

11. On June 24, 2020, the BOCC adopted and recorded the County Manager Policy ("CMP") with the Elbert County Recorder's Office. The CMP can be found at Book: 804, Page: 905,

2

POL.  **See Exhibit 1**, *County Manager Policy*, attached hereto.  Shawn Fletcher is the current county manager.

**12.**	In or around September of 2023, Delores Grady, manager of human resources for the County, sent an email to all department heads and elected county officers.  Attached to the email was the new disciplinary policy for the County.[1]  **See Exhibit 2**, *September 2023 Email from Delores Grady*, attached hereto.

**13.**	Shortly after receiving the new discipline policy, Sheriff Norton contacted the county manager, Mr. Fletcher, to inform him that the county's new disciplinary policy would not be applicable to the LEOs and support staff of the ECSO.  Mr. Fletcher became very angry and stated to Sheriff Norton, "we'll see about that!"

**14.**	Shortly after the above referenced conversation between Sheriff Norton and Mr. Fletcher, Mr. Fletcher began a campaign of harassing Sheriff Norton, staff and LEOs of the ECSO, and the ECSO in general.

**15.**	Mr. Fletcher decreased the merit-based increases for LEOS from an average of 5-7% to a maximum of 2%[2].

**16.**	After Sheriff Norton informed Mr. Fletcher that ECSO LEOs and staff would be subject to the policies of the ECSO instead of the county's disciplinary policy, Mr. Fletcher and Ms. Grady deleted Amy Fordyce's access to the county's payroll system, Paylocity. Ms. Fordyce had been the payroll administrator for the ECSO for the previous nine years.  Mr. Fletcher decided unilaterally to terminate Ms. Fordyce's access to Paylocity, and then, Mr. Fletcher and Mr. Grady informed Sheriff Norton that if he wanted his people to get paid, then he would be forced to appoint an ECSO supervisor of Mr. Fletcher's designation who would be accessing Paylocity on behalf of the ECSO.[3]

---

[1]  Attached hereto with Exhibit 2, is the Ford County, Kansas Discipline Policy from November of 2000.  Ford County is the county where Mr. Fletcher was the former assistant county administrator.  Elbert County's disciplinary policy is identical to Ford County's 2000 policy.

[2]  The starting salary of a new deputy in Elbert County is $70,000.  On June 13, 2024, Mr. Fletcher received a pay and benefits increase totaling $125,831 per year.

[3] It is worth noting here that for the past year and a half prior to this filing, there had been a series of overreaching retaliatory events directed at the ECSO and others who supported the ECSO.  The actions and events were perpetrated by and/or at the direction of the BOCC and the county manager. One such incident occurred when Undersheriff Fisher reported to Tony Lave and Darren Adame of building services that leaks were occurring in the roof of the ECSO above the administrator's office and leaks in the roof of the jail.  Around the same time, staff of the ECSO began complaining of the smell of mold and began suffering from illnesses related to mold sickness including coughs, sneezing, and headaches.  Mr. Lave arranged for a couple of companies to perform initial testing and mitigation including cleaning and removal of possible mold that had formed in the ventilation system and likely the carpets in the ECSO, courthouse, and jail. Mr. Fletcher and at least one commissioner were notified about the health issues and the complaints of mold at the ECSO and jail.  Mr. Fletcher would later terminate both Mr. Lave and Mr. Adame.  Despite being statutorily required to examine the jail at least yearly, the BOCC has examined the

**17.** During a reporting of mold within the ECSO and courthouse, Sheriff Norton allowed a staff member who was exhibiting signs of mold-related illness to work from home. That employee would later resign his position due to the county manager instructing him that he must return to work. After the mold issue was resolved in the building of the ECSO and courthouse, Sheriff Norton attempted to rehire the former employee into the former employee's previous position at the ECSO. Sheriff Norton reposted the job opening pursuant to all state and local job vacancy requirements. In a letter to the Sheriff, Mr. Fletcher stated that the Sheriff must have the county manager's permission on where, when, and how employees of ECSO may perform his/her duties, especially in reference to this specific employee. Mr. Fletcher stated that Sheriff Norton could not allow ECSO personnel to work from home **unless the Sheriff had Mr. Fletcher's permission to do so.** See Exhibit 4, *Letter form Shawn Fletcher to Sheriff Norton*, attached hereto. (Please note that much of Exhibit 4 has been redacted because the letter addresses confidential health issues of a former ECSO employee who has not waived his/her doctor-patient privilege.)

When the former employee applied for his previous job at the ECSO, Mr. Fletcher and Ms. Grady notified the former employee that his application was denied and he would not be hired at the ECSO because he was not qualified for the position he previously held. Neither Mr. Fletcher nor Ms. Grady notified Sheriff Norton of their decision regarding the former employee. Upon information and belief, Commissioner Richardson, Commissioner Schroeder, Mr. Fletcher, and County Attorney Greer conducted a meeting and reached the conclusion about the former employer. Mr. Fletcher and Ms. Grady carried out the orders and conclusions of the two commissioners and the County Attorney.[4]

**18.** Mr. Fletcher and Ms. Grady threatened ECSO's employees and LEOs with termination of their employment with the ECSO if they refused to cooperate with confidential investigations into the ECSO and sign affidavits regarding any declarations made in relation to such investigations. The ECSO Undersheriff, David Fisher, was one of approximately 6-10 ECSO staff and LEOs to receive the threatening letters. **See** Exhibit 3, *Email from Delores Grady*, attached hereto.

**19.** During January of 2024, while driving his patrol vehicle, a deputy was forced off a snow-covered highway (Elbert Road) by an oncoming vehicle. There were no other vehicles damaged, no injuries occurred, and only a fence was slightly damaged and later repaired. Colorado State Police investigated the incident and found no suspicious activity and no fault of the deputy. The deputy involved in the accident was not injured; he was not issued any citations; and there

---

jail only twice in the past five years. "It is the duty of the board of county commissioners, as often as they deem necessary, **but at least once annually**, to make personal examination of the jail of its county, its sufficiency, and the management thereof and to **correct all irregularities and improprieties therein found**." *C.R.S. § 17-26-126* (emphasis added).

[4] It is important to note here, that these meetings where two or more of the commissioners were in attendance and discussing and deciding upon county policies were likely violations of the Colorado Sunshine Law, Title 24, Article 6, C.R.S. and more specifically parts 1-4. Sheriff Norton was present for at least two such meetings.

existed no reasonable suspicion that the deputy was under the influence of alcohol and/or drugs. Pursuant to ECSO policies the deputy was not subjected to drug and alcohol testing subsequent to sliding off of the highway in his patrol vehicle. This infuriated the county manager.

**20.**     Shortly after the accident, the county manager, Shawn Fletcher, contacted Sheriff Norton to inquire as to why the deputy involved in the accident had not been subjected to drug and alcohol testing. Mr. Fletcher stated to Sheriff Norton that it was county policy that all persons involved in any accident on county property or while operating a county vehicle must be subjected to drug and alcohol testing.[5] Sheriff Norton explained to Mr. Fletcher that the incident that involved a LEO of ECSO was subject to ECSO policies, not county policies. Mr. Fletcher became very upset with Sheriff Norton. On February 12, 2024 at approximately 12:15 p.m., Mr. Fletcher called Sheriff Norton and asked again if Sheriff Norton was going to abide by county policy regarding the accident. Sheriff Norton again explained that he, the Sheriff, was responsible for his deputies and establishing policies for the ECSO and such policies were applicable to the accident, not the county's general policy. Mr. Fletcher became enraged and began yelling at Sheriff Norton promising him, "you haven't heard that last of this," and he hung up on Sheriff Norton.

**21.**     Shortly after the phone call, Mr. Fletcher launched two investigations into the operations of the ECSO, its deputies, and its staff. Mr. Fletcher hired two separate companies, Ruben Brown and Employers Council. The county manager spent $24,000 to conduct investigations into the ECSO, the Sheriff, staff, and LEOs. The investigations produced no actionable results.[6]

**22.**     On July 24, 2024, the BOCC adopted a new Elbert County Fleet and County Vehicle Management Policy ("Fleet Policy") that restricts how the Sheriff may utilize patrol vehicles including, but not limited to, who may operate the patrol vehicles, when the patrol vehicles may be operated, how the patrol vehicles may be operated, and shifts disciplinary authority from the Sheriff to the BOCC for any violations of the Fleet Policy by deputies or ECSO staff. **See Exhibit 5**, *Elbert County Fleet and County Vehicle Management Policy*, attached hereto.

---

[5] It is worth noting here, that if it were county policy as stated by Mr. Fletcher that all employees of the county be subjected to alcohol and drug testing upon the occurrence of an accident on county property or while operating a county vehicle, then such policy has not been applied equally. In December of 2022, the county attorney, Bart Greer, struck another employee's (Bobby Chevarria) vehicle on county property. Mr. Greer left the scene of the accident without reporting it to Mr. Chevarria or law enforcement. That afternoon, Mr. Chevarria noticed the damage to his vehicle, and he reported to ECSO. Deputy Pastore responded. The following day, Mr. Chevarria confronted Attorney Greer about the accident. Attorney Greer admitted to striking Mr. Chevarria's vehicle, and he offered Mr. Chevarria $500 cash to settle the issue. Mr. Greer was never subjected to drug and alcohol testing as a result of the accident that occurred on county property. Based upon information and belief, Mr. Greer would shortly thereafter draft the documentation for Mr. Chevarria's termination.

[6] Yet again, it is worth noting that the county manager, the BOCC, and the county attorney withheld the results of the investigations from Sheriff Norton for an extended period even after repeated requests for disclosures of the investigations and their results. Undersheriff Fisher filed multiple CORA requests related to the investigations and was denied access to the documents.

**23.** On or about September 9, 2024, Sheriff Norton rehired a former deputy for the ECSO. The county manager and Ms. Grady implemented a procedure during the onboarding process where no employee, including deputies and staff of the ECSO, may be hired by **any officer of the County** unless the prospective deputy and/or staff member signs an acknowledgment form stating that he/she is subject to the county policies and agree to abide by such policies. The new deputy could not be hired by the Sheriff unless the new deputy first agreed to sign off on the applicability of the county's policies to him.

**24.** Elbert County is a member of the Eastern District of Colorado Counties, Inc.[7], a Colorado non-profit corporation pursuant to C.R.S. § 7-13-201.

**25.** Elbert County Commissioner and Chairman of the BOCC, Chris Richardson, is the current Vice Chair for the Transportation & Telecommunications Steering Committee for CCI. *Colorado Counties, Inc.*, https://ccionline.org/about/steering-committees/, last accessed September 23, 2024, 1:21 p.m.

**Legal Authority**

**26.** "District and superior courts within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceedings shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." *C.R.C.P. 57(a)*.

**27.** "Courts of record within their respective jurisdictions have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." *C.R.S. § 13-51-105*.

---

[7] According to the Bylaws of CCI, the objects and purposes of this Corporation are and shall be, by association, to cultivate a more general knowledge and to encourage a greater interest among the counties of the State of Colorado in the administration of county government; to consider and, by discussion and united action, work toward the solution of the many financial, administrative, legislative, road construction and maintenance, social services and other problems which exist in connection with county and local government, in the interest of the people of the respective counties, and the State of Colorado; and, further: (1) To preserve, promote and strengthen county and local units of government . . . (3) To cooperate with national and state departments so that the taxpayers will receive full value for their tax dollars; (4) To develop a high level of service so that economy and efficiency consistent with good management principles can be practiced; (5) To establish and support a medium for the exchange of ideas and experience of county officials throughout the state and nation to be used in working toward a solution of county problems . . . (7) **To serve faithfully the people of our respective counties;** (8) To identify and address issues which are unique to urban and/or rural counties and work with the legislature and other jurisdictions to respond to those issues; and (9) To improve legislative awareness and responsiveness to urban and/or rural impacts. *Second Restated and Amended Bylaws of Colorado Counties, Inc.*, Article II, Objects, Purposes, and Powers, p. 3, https://ccionline.org/wp-content/uploads/2023/10/CCI-Bylaws-adopted-12-13-2022.pdf, last accessed September 23, 2024, 1:11 p.m (emphasis added).

**28.** C.R.C.P. 57 and C.R.S. §§ 13-51-102-05 are "remedial in nature and should be liberally construed to 'afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.' The Colorado Supreme Court 'has long acknowledged that litigants can use C.R.C.P. 57 to request the resolution of questions regarding the validity or interpretation of a piece of legislation.' 'One whose rights are affected by a statute may have its construction or validity determined by declaratory judgment.'" *City of Boulder v. Pub. Serv. Co. of Colo.*, 420 P.3d 289, 295 (Colo. 2018).

**29.** "Any person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *C.R.S. § 13-51-106.*

**30.** "One whose rights are affected by a statute may have its construction or validity determined by declaratory judgment. The primary purpose of the declaratory judgment procedure is to provide a speedy, inexpensive, and readily accessible means of determining actual controversies which depend on the validity or interpretation of some written instrument or law." *Toncray v. Dolan*, 593 P.2d 956, 957 (Colo. 1979).

**31.** "There shall be elected in each county, at the same time at which members of the general assembly are elected, commencing in the year nineteen hundred and fifty-four, and every four years thereafter . . . one sheriff . . . . The term of office of all such officials shall be four years, and they shall take office on the second Tuesday in January next following their election, or at such other time as may be provided by law." *Colo. Const. Article XIV, § 8*.

**32.** "**A sheriff shall be elected in each county for the term of four years** and . . . shall execute to the people of the state of Colorado a bond, with at least three sufficient sureties, in the sum of not less than five thousand nor more than twenty thousand dollars, which the board of county commissioners, or, if it is not in session, the county clerk and recorder, subject to the approval of such board at its next session thereafter, shall specify and approve . . . . In lieu of the bond . . . a county may purchase crime insurance coverage in an amount not less than ten thousand dollars on behalf of the sheriff to protect the people of the county from any malfeasance on the part of the sheriff while in office." *C.R.S. § 30-10-501(1-2).*

**33.** "Each sheriff may appoint as many deputies as the sheriff may think proper and **may revoke such appointments at will**; except that **a sheriff shall adopt personnel policies, including policies for the review of revocation of appointments**. Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and **shall give the deputy an opportunity to be heard by the sheriff.** Persons may also be deputized by the sheriff or undersheriff in writing to do particular acts." *C.R.S. § 30-10-506* (emphasis added).

**34.** The power of the county sheriff to hire and fire deputies "[at will]" (Colo. Rev. Stat. § 30-10-506) walks in tandem with [the Sheriff's] personal liability for their actions. *People ex rel. Coover v. Guthner*, 94 P.2d 699 (Colo. 1939).

**35.** "As the statutory language indicates, the county sheriff must post official bond for default or misconduct of his sureties. **The sheriff must retain a certain amount of policy-making autonomy to ensure his deputies conduct themselves in a professional manner when on duty**." *Seeley v. Board of Comm'rs*, 654 F.Supp. 1309, 1313-14 (Colo. Dist. 1987) (emphasis added).

**36.** "**The sheriff, not the county or the board of county commissioners, has the right of control with respect to deputies.**" *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650 (Colo. App. 2000); *Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213 (10th Cir. 2002) (emphasis added).

**37.** **Under both the Colorado Constitution and applicable statutes, sheriffs and boards of county commissioners are treated as separate public entities having different powers and responsibilities.** Colo. Const. art XIV, 8 and 8.5, treat boards of county commissioners and sheriffs as separate entities, and various statutory provisions enumerate the respective specific responsibilities and powers of a county sheriff, a county, and a county board of commissioners. See 30-10-501, et seq., 30-11-101, and 30-11-107, C.R.S. 1998. *Tungent v. Board of County Comm'rs*, 992 P.2d 650, 651-52 (Colo. App. 1999) (emphasis added).

**38.** Board of county commissioners cannot be held liable for actions of a sheriff's deputy under the doctrine of *respondeat superior*. *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650 (Colo. App. 1999).

**39.** "**The general powers conferred upon the board of commissioners . . . when in conflict with the special, particular powers conferred upon the sheriff with reference to jails, must yield to the latter, the latter must be treated as exceptions to the former.**" *Richart v. Bd. of Comm'rs*, 95 Colo. 153, 33 P.2d 971 (1934) (emphasis added).

**40.** "A sheriff has great responsibilities, and he could not perform his duties if he was subject to interference by the commissioners." *Richart v. Board of Comm'rs*, 33 P.2d 971 (Colo. 1934).

**41.** "The general powers conferred upon the board with reference to the county's property generally, when in conflict with the special and particular powers conferred upon the sheriff with reference to jails, must yield to the latter; the latter must be treated as exceptions to the former." *Richart*, 33 P.2d at 973.

**42.** "In general, the powers and duties of officers are prescribed by the Constitution or by statute, or both, and they are measured by the terms and necessary implication of the grant, and must be executed in the manner directed and by the officer specified. If broader powers are desirable, they must be conferred by the proper authority. They cannot be merely assumed by

8

administrative officers; nor can they be created by the courts in the proper exercise of their judicial functions. No consideration of public policy can properly induce a court to reject the statutory definition of the powers of an officer." *Skidmore v. O'Rourke*, 383 P.2d 473, 474 (Colo. 1963).

43. "The sheriff 'is an officer of the court, charged with the duty of carrying out the orders and decrees of the court.' The sheriff is not required to assess the validity of court orders as a prerequisite to execution, nor is the sheriff liable for carrying out the orders of the court. *Struble v. Barger*, 261 P.2d 497, 498 (Colo. 1953); see also *County Sheriffs in Colorado: Beyond the Myth*", 38 Colo. Law. 19 (Feb. 2009).

44. "The sheriff, in person or by his undersheriff or deputy, shall serve and execute, according to law, all processes, writs, precepts, and orders issued or made by lawful authority and to him directed, and shall serve the several courts of record held in his county." C.R.S. § 30-10-515.

**Claims for Relief/Analysis and Argument**

45. "[T]he office of sheriff [is] the most important of all the executive officers of the county. . . ."    -Thomas Jefferson (Excerpt from letter written by Thomas Jefferson to Samuel Kercheval (July 12, 1816)).

**First Claim for Relief – Declaratory Judgment**
**Issue I: Did Board Exceed Authority by Interfering with Sheriff's Authority re Hiring and Terminating ECSO Deputies and Staff?**

46. The Office of Sheriff is a constitutional office. Colo. Const. art. XIV, § 8; see also C.R.S. § 30-10-501.

47. "The . . . constitutional officers in each county elected to four-year terms are the county clerk and recorder, county assessor, county treasurer, **county sheriff**, county coroner and the county surveyor. Their powers and duties are prescribed by state statute. Constitutionally and statutorily, they are independent from each other and from the county commissioners. **County commissioners have no direct authority over the other elected officials in the county** except that commissioners do approve budgets for all the other elected officials' departments. Colorado Counties, Inc, *Commissioner Handbook, Chapter 1: County Government in Colorado – An Overview*, p. 3, https://ccionline.org/doc/chapter-1-county-government-in-colorado-an-overview/, last accessed September 23, 2024, 1:30 p.m. (emphasis added).

48. A sheriff has great responsibilities, and he could not perform his duties if he was subject to interference by the commissioners. *Richart v. Board of Comm'rs*, 33 P.2d 971 (Colo. 1934).

49. Constitutionally and statutorily, Sheriff Norton, possesses sole authority regarding the hiring and termination of deputies and support staff for the ECSO. C.R.S. § 30-10-506; see also

9

*People ex rel. Coover v. Guthner*, 94 P.2d 699, 700 (Colo. 1939); *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650 (Colo. App. 2000); *Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213 (10th Cir. 2002).

**50.** On or about June 24, 2020, the BOCC adopted the CMP for Elbert County. "The County Manager is the official link between the [BOCC] and the operations and staff of departments of County Government." **See Exhibit 1**, ELBERT COUNTY GOVERNMENT, County Manager Policy, ¶ A, attached hereto.

**51.** The BOCC, via the county manager, implemented an employment policy that interferes with the sole legal authority of Sheriff Norton in the hiring of deputies and support staff at the ECSO. On or about September 9, 2024, Sheriff Norton was informed by Deputy Tanner that the county had prohibited Deputy Tanner from proceeding with the onboarding (hiring) process unless he first agreed to check a box that he "Agreed" that he was subject to county policies including the disciplinary and fleet policies with no mention of the ECSO policies. Prior to the county manager's personal dispute with Sheriff Norton, deputies and possible new employees of the ECSO were allowed to bypass the option that requires them to agree to "County Policies" in lieu of ECSO policies. Effectively, the BOCC via Mr. Fletcher has superseded Sheriff Norton's statutory hiring authority by preventing future ECSO deputies and staff from completing the hiring process unless the prospective deputy/employee of the ECSO admits and agrees that he/she is subject to county policies.

**52.** On or about September 10, 2024, Sheriff Norton notified Mr. Fletcher and County Attorney Greer of the legal problem with requiring deputies to first agree to be bound by county policies including disciplinary and fleet policies before they could be hired. Attorney Greer acknowledged and admitted that such was and issue, yet nothing has changed regarding the hiring process of deputies and ECSO staff.

**53.** Commissioner Richardson is the Chairman of the BOCC who fully supports and participates in Mr. Fletcher's harassment of the ECSO in pursuit of their dispute with Sheriff Norton. Commissioner Richardson is further a vice-chair of a steering committee of the CCI. The CCI plainly instructs its members, including Commissioner Richardson, in its Commissioner Handbook that Sheriff Norton's "**powers and duties are prescribed . . . [c]onstitutionally and statutorily, [and such powers] are independent from . . . the county commissioners. County commissioners have no direct authority over the other elected officials in the county.**" Colorado Counties, Inc, *Commissioner Handbook, Chapter 1: County Government in Colorado – An Overview*, p. 3, https://ccionline.org/doc/chapter-1-county-government-in-colorado-an-overview/, last accessed September 23, 2024, 1:30 p.m. (emphasis added).

**54.** During the hiring process of another former employee who the Sheriff had previously approved, both Mr. Fletcher and Ms. Grady, at the direction of the BOCC, directly interfered with Sheriff Norton's authority to hire ECSO staff by informing the former employee that he was not qualified to retain his former position with the ECSO. This decision was made unilaterally by the BOCC, the County Attorney, Mr. Fletcher, and Ms. Grady. The notice of denial of

application was authorized and executed by Mr. Fletcher and Ms. Grady. Sheriff Norton did not learn about the denial of application until he was informed days later by the applicant.

**55.** The incident described in paragraph 54 *supra*, is not the first occurrence of the BOCC and the county manager interfering with Sheriff's Norton's authority. For additional examples of the BOCC and the county manager interfering with Sheriff Norton's constitutional authority, *see* Exhibits 1-5 attached hereto. The exhibits and interferences will be discussed more fully below.

**56.**  On or about September 7, 2023, Delores Grady emailed a copy of the Elbert County Discipline Policy (Exhibit 2) to "Department Heads and Elected Officials." Sheriff Norton and and Undersheriff Fisher were included in the email. The first mistake of the email and the policy is lumping "Department Heads and Elected Officials" into the same category. The CCI, is the foremost educational and membership organization for counties and county commissioners in Colorado. In its handbook for commissioners, it plainly states that "**powers and duties are prescribed . . . [c]onstitutionally and statutorily, [and such powers] are independent from . . . the county commissioners. County commissioners have no direct authority over the other elected officials in the county.**" Colorado Counties, Inc, *Commissioner Handbook, Chapter 1: County Government in Colorado – An Overview*, p. 3, https://ccionline.org/doc/chapter-1-county-government-in-colorado-an-overview/, last accessed September 23, 2024, 1:30 p.m. (emphasis added). Numerous cases and statutes cited as legal authority throughout this Complaint support the statement from the Handbook. Yet, the BOCC, the county manager, and unfortunately, the county attorney, seem to be unable to comprehend the separate legal stature that Sheriff Norton and the ECSO possess. In short, none of them seem to be able to discern the difference between a "department" within the County and a constitutional office despite the language of the Constitution, statutes, and case law being crystal clear on the subject.

In the Elbert County Discipline Policy, the language states, " . . . Elected Officials are responsible for the conduct and effective performance of all employees under their jurisdiction and shall have the authority and the responsibility to discipline employees . . ." First, neither the BOCC, the county manager, nor Delores Grady have authority over Sheriff Norton to inform him of his responsibilities regarding his LEOs and staff. Sheriff Norton's responsibilities are statutory and plainly set forth in C.R.S. Title 30, article 10, part 5.

**57.** On January 24, 2024, the BOCC with approval from the county attorney, adopted the Elbert County Fleet and County Vehicle Management Policy (the "Fleet Policy"). **See** Exhibit 5, attached hereto. The Fleet Policy will be addressed further within Issue III, *infra*. On page 8 of the Fleet Policy, ¶¶ 12.1.3 and 12.1.5 state, "[t]his policy applies to **all employees** who use County vehicles for any reason . . . Each Elected Official . . . is responsible and accountable for the actions of his or her supervised employees covered under this policy and is responsible for enforcing this policy with subordinates."

On page 17, ¶¶ 15.2.9 and 15.2.10, the BOCC incorporates a disciplinary and termination policy specifically directed at "Sheriff's Office personnel" who operate county vehicles. Authority over hiring, termination, and discipline of deputies and staff of the sheriff is specifically proscribed

11

to the sheriff of a county via C.R.S. §§ 30-10-506 and 509.  Had the legislature intended to provide the BOCC with authority to set policies for the ECSO or to hire, fire, and discipline deputies and staff of the ECSO, then the legislature could have added that responsibility in C.R.S. § 30-10-506, but it did not do so.  The liability for his deputies and staff lies solely with Sheriff Norton, and therefore he establishes the policies that his subordinates must adhere to.  "As the statutory language indicates, the county sheriff must post official bond for default or misconduct of his sureties. **The sheriff must retain a certain amount of policy-making autonomy to ensure his deputies conduct themselves in a professional manner when on duty**." *Seeley v. Board of Comm'rs*, 654 F.Supp. 1309, 1313-14 (Colo. Dist. 1987) (emphasis added).

Yet again, here with the Fleet Policy, the BOCC, with the approval of the county attorney[8], is setting a policy applicable to Sheriff Norton and his deputies despite "**[c]ounty commissioners hav[ing] no direct authority over the other elected officials in the county.**"

58.    On April 4, 2024, Delores Grady, emailed Undersheriff Fisher regarding a confidential internal investigation of the ECSO that the county manager had initiated.  In her email, Ms. Grady threatened Undersheriff Fisher with "disciplinary action, up to and including termination," if he failed to "comply with the investigation."  Upon information and belief, at all times pertinent hereto, Delores Grady was acting at the direction of the county manager, Shawn Fletcher.  First and foremost, neither the BOCC, the county manager, and especially not Delores Grady possess authority to discipline and/or terminate the Undersheriff.  The employment of the Undersheriff and his duties are specifically regulated by C.R.S. §§ 30-10-504 and 505[9].  Second, this same threat was emailed by Delores Grady to at least half-dozen ECSO deputies and staff.

59.    On Issue I, Sheriff Norton and the ECSO seek a declaratory judgment from this Court affirming that the BOCC through its policies and practices have superseded its authority and interfered with Sheriff Norton's sole constitutional and statutory authority regarding the establishing of policies relating to the hiring, termination, and discipline of deputies and support staff at the ECSO as well as interfered with Sheriff Norton's sole authority to hire, terminate, and discipline deputies and staff of the ECSO.

---

[8] The County Attorney, as a licensed Colorado attorney, has a duty to represent the best interests of his clients.  As a county attorney, Mr. Greer has a duty to advise and defend, if necessary, county officials, department heads, and other policy makers of the county including Sheriff Norton.  It is unclear how Attorney Greer has continued to advise the BOCC, the county manager, and department heads in this legal dispute between the BOCC and county manager and Sheriff Norton.  It is especially unclear how the county attorney can sign off as to the form and context of the Fleet Policy when the policy is in such conflict with the statutory and constitutional authority of Sheriff Norton, the county attorney's client.  At a minimum, the county attorney should have recused himself from all policy issues and disputes related to the BOCC and the ECSO.

[9] The sheriff of each county, as soon as may be after entering upon the duties of his office, shall appoint some proper person undersheriff of said county, who shall also be a general deputy, to serve during the pleasure of the sheriff. As often as a vacancy occurs in the office of such undersheriff, or he becomes incapable of executing the same, another shall in like manner be appointed in his place. *C.R.S. § 30-10-504*.

**Second Claim for Relief – Declaratory Judgment**
**Issue II – Does the BOCC, County Manager, or any other Department Head Possess Authority related to the Assignment of Responsibilities and Duties of ECSO Deputies and Staff**

**60.** At all times pertinent hereto, the BOCC and especially the county manager, have engaged in activities that suggest they believe that they have authority to set policies and procedures for the ECSO.

**61.** The county manager has taken personal and as an offense to his authority, Sheriff Norton's refusal to implement at the ECSO the new policies established and adopted by the county manager and the BOCC.

**62.** After Sheriff Norton informed the county manager, Mr. Fletcher, that Mr. Fletcher's policies, especially the county's disciplinary policies, would not be applied to ECSO deputies and staff, but instead the Sheriff would utilize the ECSO's disciplinary policy, Mr. Fletcher became enraged and made professional threats against the Sheriff. Shortly thereafter, Mr. Fletcher and Ms. Grady deleted the ECSO payroll administrator's access to the county's payroll system, Paylocity. Amy Fordyce had been the payroll administrator for the ECSO for the previous nine years under two different sheriffs. In retaliation for the Sheriff not implementing Mr. Fletcher's policies at the ECSO, Mr. Fletcher decided unilaterally to terminate Ms. Fordyce's access to Paylocity, and then, Mr. Fletcher and Mr. Grady informed Sheriff Norton that if he wanted his people to get paid, then Sheriff Norton would be forced to appoint someone of Mr. Fletcher's designation who would be accessing Paylocity on behalf of the ECSO. To restore the ECSO's access to the payroll system, Mr. Fletcher insisted on a supervising deputy being pulled off his regular law enforcement duties to input payroll into the system if ECSO deputies and staff were to be paid.

**63.** The CMP sets forth the county manager's authority and responsibilities regarding supervision of employees and implementation of policies of the County. One of the questionable duties is the county manager has

> authority to investigate problems with "elected . . . Department Directors and their staff . . .. Employment decisions regarding the staff of elected officials shall be made in cooperation between the County Manager, and the applicable elected official. The County Manager, with the input, investigation, coordination, and recommendations of County's Human Resources staff, shall make recommendations regarding the employment and performance of the staff of elected officials, and shall have final authority regarding employment and performance decisions relating to non-elected County employees and staff. Nothing in this policy shall limit the power of either the County Manager or the BOCC . . . to investigate elected officials and their staff.

13

**See Exhibit 1**, County Manager Policy, p. 1, ¶¶ 1-2.

**64.**     The powers of the BOCC are statutory and provided for in C.R.S. § 30-11-107.  Had the legislature intended to provide the BOCC with powers over the Sheriff, it could have done so in C.R.S. § 30-11-107.  However, the legislature did not grant the BOCC any such powers.  The only powers of the BOCC granted by the legislature in relation to the sheriff's office is the power "[t]o purchase all necessary uniforms of the county sheriff, undersheriff, and deputies of the county; but no such uniforms shall be supplied to those persons deputized to perform particular acts, and all such uniforms shall be and remain the property of the county . . .." *C.R.S. § 30-11-107(p)*.  Somehow, the BOCC believes it possesses the authority to grant to the county manager, via the County Manager Policy, the authority to supervise the activities of the Sheriff and draft and administer policies applicable to the Sheriff, the ECSO in general, the deputies, and the ECSO staff.  The BOCC does not possess such authority and the grant of such power unto the county manager is illegal. "In general, the powers and duties of officers are prescribed by the Constitution or by statute, or both, and they are measured by the terms and necessary implication of the grant, and must be executed in the manner directed and by the officer specified. **If broader powers are desirable, they must be conferred by the proper authority. They cannot be merely assumed by administrative officers**; nor can they be created by the courts in the proper exercise of their judicial functions. No consideration of public policy can properly induce a court to reject the statutory definition of the powers of an officer." *Skidmore,* 383 P.2d at 474 (emphasis added).

**65.**     Again, the Sheriff is an elected official of the County, and **"[c]ounty commissioners have no direct authority over the other elected officials in the county."**   In short, the BOCC lacks the authority to make employment decisions for other elected officials much less assign such imaginary authority to the county manager. **See** CCI Commissioner Handbook (emphasis added); (A sheriff has great responsibilities, and he could not perform his duties if he was subject to interference by the commissioners. *Richart v. Board of Comm'rs*, 33 P.2d 971 (Colo. 1934)); (Constitutionally and statutorily, a sheriff possesses sole authority regarding the hiring and termination of deputies and support staff.  C.R.S. § 30-10-506; see also *People ex rel. Coover v. Guthner*, 94 P.2d 699, 700 (Colo. 1939)); see also *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650 (Colo. App. 2000); *Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213 (10th Cir. 2002); see also *Skidmore v. O'Rourke*, 383 P.2d 473, 474 (Colo. 1963).

**66.**     The BOCC has exceeded its authority in granting the county manager authority regarding employment decisions of the staff of elected officials, specifically the staff of the ECSO.  The Sheriff is liable for his subordinates, and he must post an official bond for default or misconduct of his subordinates. **The sheriff must retain a certain amount of policy-making autonomy to ensure his deputies conduct themselves in a professional manner when on duty**." *Seeley v. Board of Comm'rs*, 654 F.Supp. 1309, 1313-14 (Colo. Dist. 1987) (emphasis added).

**67.**     On Issue II, Sheriff Norton and the ECSO seek a declaratory judgment from this Court affirming that the BOCC exceeded its authority by granting the county manager authority over employment decisions and staffing regarding the Sheriff's deputies and staff.  More specifically,

the Sheriff and ECSO seek an order affirming that the County exceeded its authority when it deleted the ECSO's payroll administrator's access to the Paylocity payroll system and then forced the Sheriff to appoint and deputy of the county manager's choosing to perform payroll duties for the ECSO.

**Third Claim for Relief – Declaratory Judgment**
**Issue III – Did the BOCC Exceed its Authority by Establishing Policies in the Fleet Policy that Interfere with the Sheriff's Constitutional and Statutory Authority regarding ECSO Policies on the Use of Patrol Vehicles.**

**68.** On July 24, 2024, the BOCC adopted a new Fleet Policy that restricts how the Sheriff may utilize patrol vehicles, sets policies for deputies who drive vehicles, and sets forth procedures regarding disciplinary measures for deputies who utilize patrol vehicles in violation of the Fleet Policy. **See Exhibit 5**, *Elbert County Fleet and County Vehicle Management Policy*, attached hereto.

**69.** Pursuant to C.R.S. §§ 30-10-503 the former Sheriff, Shane Heap, surrendered all possessions of the ECSO upon Sheriff Norton's qualification as Sheriff pursuant to C.R.S. § 30-10-501.5. Those possessions included all motor vehicles assigned to the ECSO.

**70.** The BOCC's duties regarding real and personal property that is utilized by the ECSO is "[t]o purchase and hold real and personal property for the use of the county . . .." *C.R.S. § 30-11-101*. "Any real or personal property conveyed to any county shall be deemed the property of such county." *C.R.S. § 30-11-102*. However, once the Sheriff takes possession of the property, whether real or personal, the Sheriff determines all policies related to utilization of such property.

**71.** Throughout history, there have been no cases where a board of county commissioners attempted to regulate and/or control the activities of a county sheriff by regulating the sheriff's use and control over law enforcement patrol vehicles. However, there is one case which examines the utilization of county property once the sheriff of the county takes possession of such property. See *Richart*, infra

**72.** General powers of county commissioners yield to the special and particular powers of the sheriff in reference to jails. *Richart v. Board of Comm'rs*, 33 P.2d 971 (Colo. 1934). In *Richart*, the court there was forced to answer one question, "[c]an the [board] forbid the [sheriff] to use [a room in the jail] as a living room for himself and his family? We think not," the court concluded. The Court held that it is for the sheriff to determine how that room in the jail shall be used and for what purposes. *Id.* at 973. In *Richart*, the sheriff of Boulder County converted a space in the jail to living quarters for the sheriff and his family. The sheriff moved into that room in the jail himself, his wife, their six children, and the sheriff's mother-in-law. The board objected to the sheriff and his family living in the jail arguing that a jail was unsafe and was no place for a family to reside. The Court found that while the jail was the property of the county, the sheriff had charge and custody of the jail and its contents. *Id.* The court further noted that the sheriff

15

was further responsible for keeping the jail clean and safe, and failure to do so would lead to liability of the sheriff. The Court held that, [a] sheriff, in his capacity as jailer, has a great responsibility, and he cannot perform his duties properly if subject to interference by a board of county commissioners. "The [board's] authority . . . to correct irregularities and improprieties found in the jail, does not authorize the [the board] to dictate to the [sheriff] where the defendant shall clean the prisoners and permit consultation between them and their lawyers, or to require [the sheriff] to use the room in question for such purposes and for no other." *Id.*

73.     Here just as in *Richart*, the BOCC is attempting to dictate how the sheriff utilizes the county property in his possession necessary to fulfill his roles and responsibilities as Sheriff. The BOCC here is attempting to control the Sheriff via the Fleet Policy by setting policies that directly affect the ECSO, its LEOs, and staff via regulation of the patrol vehicles utilized by the ECSO. There are no differences between the vehicles at issue here and the jail in *Richart*. Both are completely necessary for the Sheriff to fulfill his constitutional and statutory duties. Sheriff Norton acknowledges that just as in *Richart*, the patrol vehicles are the property of the county, but Sheriff Norton has charge and custody of those vehicles and their contents and accessories.

74.     Despite Sheriff Norton being in charge and custody of the patrol vehicles, the Fleet Policy states, "if the Sheriff's Office is short on patrol vehicles due to maintenance or repair such that there are insufficient patrol vehicles to staff a shift, 'take home' patrol vehicles will not be taken home, and will instead be prioritized for use as a patrol vehicle to meet complete needs of the shift for the number of patrol vehicles." **See Exhibit 5**, Fleet Policy, p. 9, ¶ 12.2.8., attached hereto. Patrol vehicles, while they are the property of the county, are law enforcement tools no different than handcuffs, tasers, guns, and yes, even a jail. While patrol vehicles may be the personal property of the County, the County surrendered custody and control of the patrol vehicles as soon as Sheriff Norton obtained the keys to the vehicles.

75.     Such duties requiring the use of patrol vehicles include, but are not limited to, a sheriff's duty to arrest, keep, and transport persons accused of and convicted of crimes. *C.R.S. § 30-10-514*; the duty to "pursue and recapture" escaped persons from jail. *C.R.S. § 17-26-127*; the duty to "make due return of any writ of process" and any other writ issued by this Court. *C.R.S. § 30-10-509*; and the duty to "keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful assemblies and insurrections." *C.R.S. § 30-10-516*. Further, **Sheriff Norton is an officer of this Court**, and as the sheriff and an officer of this Court, he must "in person or by his undersheriff or deputy, shall serve and execute, according to law, all processes, writs, precepts, and orders issued or made by lawful authority and to him directed, and shall serve the several courts of record held in [Elbert County]." *C.R.S. § 30-10-515*. None of the duties described above can be accomplished without a vehicle, and the Sheriff has sole authority to establish the policies for the use of patrol vehicles in a manner that would allow him to fulfill his duties without interference from the BOCC.

76.     The BOCC cannot be held liable for actions of a sheriff's deputy under the doctrine of *respondeat superior. Tunget v. Bd. of County Comm'rs*, 992 P.2d 650 (Colo. App. 1999). Sheriff Norton is legally liable for the safe and proper operation of the patrol vehicles by his

deputies. "As [C.R.S. § 30-10-501(a)] indicates, the county sheriff must post official bond for default or misconduct of his sureties. In being liable for the conduct of his sureties (his deputies), Sheriff Norton "must retain a certain amount of policy-making autonomy to ensure his deputies conduct themselves in a professional manner when on duty." *Seeley v. Board of Comm'rs*, 654 F.Supp. 1309, 1313-14 (Colo. Dist. 1987) (emphasis added). The Court in *Seeley* did not distinguish between different kinds of conduct of deputies that a sheriff is responsible for nor did the legislature when drafting C.R.S. § 30-10-501. Therefore, Sheriff Norton, not the BOCC is liable for all of the deputies' conduct while on duty, including the deputies' conduct of operating a patrol vehicle. "The sheriff, not the county or the board of county commissioners, has the right of control with respect to deputies." *Tunget v. Bd. of County Comm'rs, 992 P.2d 650 (Colo. App. 2000); Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213 (10th Cir. 2002).

77.     Sheriff Norton's liability for his deputies determines that "[he] **must retain a certain amount of policy-making autonomy** related to his deputies' use and operation of patrol vehicles. *Seeley,* 654 F.Supp. at 1313-14 (Colo. Dist. 1987) (emphasis added); see also *Richart v. Board of Comm'rs*, 33 P.2d 971 (Colo. 1934). This policy-making autonomy cannot be limited only to real property such as a jail, it must extend to the use of personal property of the ECSO such as patrol vehicles, guns, tasers, handcuffs, etc. Additionally, when the general powers conferred upon the board, with reference to the county's property, "conflict with the special and particular powers conferred upon the sheriff, **then the county's powers must yield to the special and particular powers of the sheriff and the sheriff's powers must be treated as exceptions to the board's powers.**" *Richart*, 33 P.2d at 973 (emphasis added). In *Richart*, the court was analyzing the sheriff's policies regarding the jail, real property of the county. Unfortunately, no sheriff could fulfill his duties as the chief law enforcement officer of the county without a jail and without the authority to set policies for the use of the jail without interference from the commissioners. *Richart* is a ninety-year-old case, and in modern times, the patrol vehicle is a piece of county property no different than a jail. The patrol vehicle is just as important to modern law enforcement as a jail ninety years ago, or a horse 150 years ago. Without the ability to set policies regarding use of the patrol vehicles and set such policies without interference by the BOCC, then Sheriff Norton cannot fulfill his constitutional and statutory duties.

78.     The BOCC further exceeds its authority by establishing additional policies for the ECSO and the use of the ECSO patrol vehicles. The BOCC unlawfully sets policies for the ECSO in the Fleet Policy in the following manners:

   a. **Page 10, ¶¶ 12.2.10.1 and .2** – Regulations on who may ride in a patrol vehicle. Restriction on ride alongs.

   b. **Page 10, ¶¶ 12.2.10.6** – policy regarding electronic and GPS monitoring of patrol vehicles.

17

    c. **Pages 10-11, ¶¶ 12.2.11.1 through .11** - Regulations regarding the off-duty use of patrol vehicles.

    d. **Page 12, ¶¶ 12.2.14 through 12.2.15.2** – Policy for safe vehicle operation and policy allowing HR to discipline deputies and staff of the ECSO.

    e. **Pages 15-17, ¶¶ 15.1, 15.1.3, 15.1.5, 15.2, 15.2.9, 15.2.10** – Vehicle accident reporting procedures and policies. Specifically the 15.2.9 and 15.2.10 set forth procedures where a deputy may be disciplined by the BOCC and the deputy must report to the BOCC and explain him/herself and why he/she should not be disciplined and/or terminated. This is in direct violation of C.R.S. § 30-10-506.

**79.** On Issue III, Sheriff Norton and the ECSO seek a declaratory judgment from this Court affirming that the BOCC exceeded its authority by establishing policies and procedures for the ECSO relating to the utilization of patrol vehicles by the deputies and staff of the ECSO as well attempting to illegally shift responsibility for the deputies and their discipline including termination and suspension from patrol from the Sheriff to the BOCC should a deputy violate the Fleet Policy. Sheriff Norton and the ECSO seeks and declaratory judgment affirming that the parts of the Fleet Policy that are applicable to the ECSO are void and of no effect because the BOCC lacks authority to establish such policies that interfere with the polices of the ECSO.

## Summation

**80.** Sheriff Norton has shown that for the past year and a half there has been a pattern of a systemic abuse of power and authority by and on behalf of the BOCC and the county manager against the citizens of Elbert County and more specifically in interference with Sheriff Norton's constitutional and statutory rights as the Sheriff of Elbert County. The BOCC and county manager have not only exceeded their authority and interfered with the Sheriff's rights and authority as described herein, the BOCC and county manager have further exceeded their authority and interfered with the duties and inner-workings of this Court by adopting policies that interfere with the Sheriff's authority as an officer of this Court.

## Request for Relief

WHERFORE, Sheriff Norton and the ECSO respectfully request that this Court issue a declaratory judgment on all three claims pursuant to C.R.C.P. 57 and C.R.S. §§ 13-51-102, 105 affirming that the BOCC and the county manager exceeded their authority in the ways, manners, and through the actions described herein, and in exceeding their authority, they have directly and illegally interfered with the constitutional and statutory rights of Sheriff Norton as the Sheriff of Elbert County. The Sheriff and the ECSO further request that all policies exceeding the BOCC's authority be determined null and void in relation to their applicable to the ECSO.

Respectfully submitted September 25, 2024.

*Original on file at:*   **Todd Collins & Associates, LLC**

s/Todd Collins
*Todd Collins, 49544*
Todd Collins & Associates, LLC
Attorney for Plaintiff

**Address of the Plaintiff/Petitioner:**

751 Ute Avenue
Kiowa, Colorado 80117